UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JAMES "JAMIE" MARSICANO | ) | Civil Action No. _____ |
| | ) | |
| Plaintiff, | ) | Judge: _____ |
| v. | ) | |
| | ) | |
| SPECIAL AGENT RYAN LONG, | ) | |
| individually, | ) | **COMPLAINT FOR DAMAGES** |
| | ) | |
| SPECIAL AGENT MICHAEL CARTER, | ) | |
| individually, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| GAME WARDEN QUINTIN REED, | ) | |
| individually, | ) | |
| | ) | |
| TROOPER CL. THOMAS, | ) | |
| individually, | ) | |
| | ) | |
| DEPUTY CHIEF JESSICA BRUCE, | ) | |
| individually, | ) | |
| | ) | |
| MAJOR JEFF CANTIN, | ) | |
| individually, | ) | |
| | ) | |
| DEPUTY CHIEF GARY HARPER, | ) | |
| individually, | ) | |
| | ) | |
| JOHN AND JANE DOE'S 1-100, | ) | |
| employees, agents, and officers of several | ) | |
| Georgia law enforcement agencies, and | ) | |
| | ) | |
| CITY OF ATLANTA, | ) | |
| Georgia municipality, | ) | |
| | ) | |
| Defendants. | ) | |

**COMES NOW**, the Plaintiff, James "Jamie" Marsicano, through undersigned Counsel,

before this Court, to file this COMPLAINT, requesting legal relief for unconstitutional and

tortious conduct committed by Special Agent Ryan Long, Special Agent Michael Carter, Game

Warden Quintin Reed, Trooper Cl. Thomas, Deputy Chief Jessica Bruce, Major Jeff Cantin,

Deputy Chief Gary Harper, John and Jane Doe's 1-100, and the City of Atlanta (collectively,

"Defendants"). The egregious and unreasonable actions of Defendants violated Plaintiff's

statutory rights pursuant to 42 U.S.C. § 1983, specifically, Plaintiff's clearly established rights

under the First, Fourth, and Fourteenth Amendments of the United States Constitution, as well as

Georgia statutory rights under O.C.G.A. § 51-7-40. Plaintiff now seeks damages, all costs and

fees, and further relief as justice requires. Plaintiff demands a jury trial.

## **PARTIES**

1.  Plaintiff Jamie Marsicano is a non-binary individual who resides in Durham County,
    North Carolina. They were a law student at the University of North Carolina Chapel
    Hill between September 2021 and May 2024, when they graduated in good standing.

2.  Defendant Special Agent Ryan Long ("Defendant Long") is a Georgia resident and
    sworn officer employed by the Georgia Bureau of Investigations. At all relevant times
    of this Complaint, Defendant Long was on-duty as a law enforcement officer of the
    Georgia Bureau of Investigations, was the supervisor of Defendant Special Agent
    Michael Carter, and was coordinating all relevant joint operations.

3.  Defendant Special Agent Michael Carter ("Defendant Carter") is a Georgia resident and
    sworn officer employed by the Georgia Bureau of Investigations. At all relevant times
    of this Complaint, Defendant Carter was on-duty as a law enforcement officer of the
    Georgia Bureau of Investigations and was coordinating all relevant joint operations.

4.  Defendant Game Warden Quintin Reed ("Defendant Reed") is a Georgia resident and
    sworn officer employed by the Department of Natural Resources ("DNR"). At all

relevant times of this Complaint, Defendant Reed was on-duty as a law enforcement officer of DNR and was an active participant in all relevant joint operations.

5.  Defendant Trooper Cl. Thomas ("Defendant Thomas") is a Georgia reisdent and sworn officer employed by the Georgia State Patrol ("GSP"). At all relevant times of this Complaint, Defendant Thomas was on-duty as a law enforcement officer of GSP and was an active participant in all relevant joint operations.

6.  Defendant Deputy Chief Jessica Bruce ("Defendant Bruce") is a Georgia resident and sworn officer employed by the Atlanta Police Department ("APD"). At all relevant times of this Complaint, Defendant Bruce was on-duty as a law enforcement officer of APD and was an active participant and coordinator of all relevant joint operations. At all relevant times of this Complaint, Defendant Bruce was a Major at APD.

7.  Defendant Major Jeff Cantin ("Defendant Cantin")  is a Georgia resident and sworn officer employed by APD. At all relevant times of this Complaint, Defendant Cantin was on-duty as a law enforcement officer of APD and was an active participant and coordinator of all relevant joint operations.

8.  Defendant Deputy Chief Gary Harper ("Defendant Harper") is a Georgia resident and sworn officer employed by APD. At all relevant times of this Complaint, Defendant Harper was on-duty as a law enforcement officer of APD and was an active participant and coordinator of all relevant joint operations.

9.  Defendants John and Jane Doe's 1-100 (collectively with Defendants Long, Carter, Reed, Thomas, Bruce, Cantin, and Harper, "Defendant Officers") are Georgia residents who were at all relevant times relevant employees, agents, and officers of participating

Georgia law enforcement agencies, the names and addresses of residence of which are unknown.

10.    Defendant City of Atlanta ("Defendant Atlanta") is a political subdivision of the State of Georgia, to wit, a municipality, located in the Northern District of Georgia, and which has the capacity to sue and be sued. At all relevant times of this Complaint, Defendant Officers were acting under Defendant Atlanta's policies and customs.

11.    Defendants are "persons" for purposes of 42 U.S.C. § 1983.

12.    At all times relevant to this cause, Defendant Officers were acting within the course and scope of their employment, and all Defendants were acting under color of law.

## SUBJECT-MATTER JURISDICTION

13.    Counts I to IV in this Complaint seeks recourse for Plaintiff based on a violation of constitutional civil rights under 42 U.S.C. § 1983, a federal statute, and, as such, this Court has jurisdiction over these Claims pursuant to 28 U.S.C. § 1331, which grants federal district courts original jurisdiction over all matters "arising under the Constitution, laws, or treaties of the United States," as well as 28 U.S.C. § 1343, given the "deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States."

14.    Count V in this Complaint seeks recourse for Plaintiff based on municipal liability due to a policy or custom that resulted in violations of constitutional civil rights under 42 U.S.C. § 1983, a federal statute, pursuant to Monell v. Dep't of Soc. Servs., 436 U.S.

658 (1978), and, as such, this Court has jurisdiction over these Claims pursuant to 28

U.S.C. § 1331, as well as 28 U.S.C. § 1343.

15.    Count VI in this Complaint seeks recourse for Plaintiff based on tortious conduct under

Georgia law, arising from the same facts as Counts I to IV, and, as such, this Court has

supplemental jurisdiction over these state-based Claims pursuant to

28 U.S.C. § 1367, because they "are so related to claims in the action within such

original jurisdiction that they form part of the same case or controversy."

16.    This Court has jurisdiction to award attorney's fees and costs to Plaintiff pursuant to

42 U.S.C. §§ 1983 and 1988.

## PERSONAL JURISDICTION

17.    Defendants have established sufficient contacts in the Northern District of Georgia,

subjecting each of them to personal jurisdiction in this district.

## VENUE

18.    Venue is proper before this Court pursuant to 28 U.S.C § 1391(b)(2) because the

events and omissions giving rise to Plaintiffs' claims occurred in Atlanta, Georgia,

which is situated within the Northern District of Georgia.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

19.    Since its announcement, the Atlanta Public Safety Training Center, popularly known as "Cop City," has faced strong and broad public opposition.[1] Opponents to the project have criticized the timing of the construction, on the heels of nationwide protests in the wake of the murder of George Floyd, as well its location, the Weelaunee Forest,[2] from which indigenous people were violently expelled in the 1800s to make way for a plantation worked by enslaved people before becoming a notorious prison camp.[3] Others have objected to the climate effects of deforesting important greenspace.[4]

20.    On January 18, 2023, Georgia law enforcement officers killed environmentalist Manuel "Tortuguita" Teran by firing 57 gunshots at them while they were inside a tent in Intrenchment Creek Park, in the Weelaunee Forest.[5]

21.    In outrage and grief at the death of a friend at hands of law enforcement, local community members organized the South River Music Festival on March 4 and 5, 2023.[6] The public, free, and political music festival featured several artists, under the banner of "Peace, Love, Unity, Respect."[7]

---

[1] Christina Maxouris, Atlanta wants to build a massive police training facility in a forest. Neighbors are fighting to stop it, CNN, Sept. 24, 2022 (accessed Feb. 21, 2025 at https://www.cnn.com/2022/09/24/us/atlanta-public-safety-training-center-plans-community/index.html); David Peisner, The Forest for the Trees, The Bitter Southerner, Jan, 20, 2023 (accessed Feb. 21, 2025, at https://bittersoutherner.com/feature/2022/the-forest-for-the-trees-atlanta-prison-farm).
[2] This swath of old-growth, urban forest is also known as the South River Forest, spanning from the location of Cop City and the Old Atlanta Prison Farm to Intrenchment Creek Park.
[3] Id.
[4] Liza Featherstone, Atlanta's "Cop City" and the Vital Fight for Urban Forests, The New Republic (accessed Feb. 21, 2025, at https://newrepublic.com/article/171055/atlanta-cop-city-vital-fight-urban-forests).
[5] Hillary Beaumont, Killed in Cop City, Rolling Stone, Oct. 16, 2023 (accessed Feb. 21, 2025, at https://www.rollingstone.com/culture/culture-features/manuel-teran-death-activist-cops-killed-questions-1234851631/).
[6] Michael Lawson, South River Festival, featuring Stefan Ringer, Savile and Zach Fox, runs from March 4th to March 5th, Resident Advisor, Feb. 22, 2023 (accessed Feb. 21, 2025 at, https://ra.co/news/78572).
[7] South River Festival (@southriverfestival), Instagram, Feb. 20, 2023, (accessed Feb. 21, 2025 at https://www.instagram.com/p/Co5nJY9___O_Xc/).

22.    Defendants Long and Carter, in concert with Defendants Bruce, Cantin, and Harper, had previously participated in and coordinated raids at Intrenchment Creek Park, and they were active in the preparation of a joint law enforcement operation to respond to the South River Music Festival.

### CITY OF ATLANTA'S BLANKET "STOP COP CITY POLICY"

23.    Defendant Atlanta has a long history of anti-protester policies, instructing its officers to act in violation of individuals' Fourth and First Amendment rights. This has included violating citizens' rights to film the police, ultimately resulting in a contempt order against Defendant Atlanta in 2015. Felicia Anderson v. City of Atlanta, 1:11-cv-03398 (N.D. Ga.). Defendant Atlanta routinely arrests protesters under pretextual criminal offenses, with numerous instances of such arrests occurring during the 2020 George Floyd protests. This includes a mass arrest on January 6, 2021, the subject of a pending lawsuit before this Court, where nineteen (19) protesters were corralled and arrested within minutes of starting to protest. Lisa Baker v. City of Atlanta et al. 1:21-cv -04186-MLB (N.D. Ga.). In that case, a high ranking officer ordered all protesters to be arrested, regardless of the underlying facts, circumstances, lawfulness, or constitutional protections. Likewise, in another 2020 protest case, a high-ranking APD officer hand-picked protesters on the road to arrest under pretextual offenses. Donovan Schilling v. Michael Doherty et al., 1:22-cv-03772-MLB (N.D. Ga.), on appeal, 25-10321-A (11th Cir.).

24.    Following this history, through a decision made by APD Chief Darin Schierbaum, a final policy-maker, Defendant Atlanta created and is enforcing an inter-agency policy

to swiftly arrest and pursue pretextual criminal charges against "Stop Cop City" protesters, that is, a person who is perceived to oppose Cop City and publicly express this political opinion in a protest ("Stop Cop City policy"). Defendant Atlanta has pursued this policy to complete construction of Cop City, a project Defendant Atlanta has spent over $100 million in tax dollars and for which it has relentlessly litigated against a lawful popular referendum. Lisa Baker et al. v. City of Atlanta et al., 1:2023-CV-02999 (N.D. Ga.), on appeal, Lisa Baker et al. v. City of Atlanta et al., 23-12469 (11th Cir.).

25.    Defendant Atlanta's Stop Cop City policy, decided by final policy-maker APD Chief Darin Schierbaum, has resulted in an express instruction to all officers from all law enforcement agencies operating with APD to arrest and pretextually charge perceived protesters who oppose Cop City, particularly if they are close or present at the Weelaunee Forest, regardless of the underlying facts, circumstances, lawfulness, or constitutional protections.

26.    Under Defendant Atlanta's Stop Cop City policy, inter-agency operations take place against public expressions of opposition to the Cop City project. Defendant Atlanta's highest officers, that is, the APD Chief, Assistant Chiefs, Majors, and Lieutenants, authorize, participate in, and execute these joint operations.

27.    Because the Stop Cop City policy has been designed and implemented by the highest officers of Defendant Atlanta, their decisions are not reviewable in any way.

28.    Pursuant to the Stop Cop City policy, on April 2022, APD Chief Darin Schierbaum sought and obtained the assistance of the Georgia Bureau of Investigations ("GBI") to

gather intelligence on protests against Cop City occurring at the Weelaunee Forest. Since then, GBI officers have regularly accompanied APD officers, including Defendants Bruce, Cantin, and Harper, in routine patrols around the area, arresting and pretextually charging individuals they would run into.

29.     To advance the Stop Cop City policy, APD Chief Darin Schierbaum has regularly delegated to high GBI agents his full and final policy-making authority. As a result, GBI agents, including Defendants Long and Carter, have continuously expanded and enforced Defendant Atlanta's Stop Cop City policy.

30.     Around April 2022, Defendant Atlanta's Stop Cop City policy expressly expanded to include the public park area of Intrenchment Creek Park. Because the Stop Cop City policy has been designed and implemented by the power of highest officers of Defendant Atlanta, this decision was not reviewable in any way.

31.     Reflective of the blanket Stop Cop City policy, documents from a Freedom of Information Act request revealed that, between 2021 and 2024, APD surveilled seemingly *every single* event expressing opposition to Cop City: "the documents include 76 intelligence reports assembled by APD containing details about 155 events, of which 111 were about the Stop Cop City movement."[8] Crucially, these events range from community gatherings and pizza parties to public rallies and calls for action, demonstrating that all protests against Cop City may face police response.

32.     Instances reflecting Defendant Atlanta's Stop Cop City policy include, but are not limited to, the following events, where law enforcement officers systematically

---

[8] Brennan Center for Justice at NYU School of Law, Atlanta Police Department Social Media Surveillance Documents, Brennan Center for Justice Research & Reports, Jul. 30, 2024 (accessed on Feb. 21, 2025, at https://www.brennancenter.org/our-work/research-reports/atlanta-police-department-social-media-surveillance-documents).

arrested and pretextually charged individuals deemed to be at or around Stop Cop City

protests, under the order and ratification of a high-ranking officer:

A.    On September 8, 2021, protesters engaged in a peaceful Stop Cop City rally in the

neighborhood of then-Councilwoman Natalyn Archibong. Under the orders of

APD Lieutenant Desmond Floyd, officers arrived and pretextually arrested the

protesters against Cop City, resulting in civil cases pending before this Court.

Johanna Gadomski et al. v. City of Atlanta et al., 1:23-CV-4036-TWT (N.D. Ga.)

(consolidated with Hadar Simon v. City of Atlanta et al.,

1:23-cv-04037-VMC; Kelsey Smith v. City of Atlanta et al., 1:23-cv-04038; Juan

Zapata v. City of Atlanta et al., 1 23-cv-04039-VMC; Lev Olmechenko v. City of

Atlanta et al., 1:23-cv-04041-VMC.) As explained, a high-ranking officer ordered

and ratified the arrests and charges, pursuant to Defendant Atlanta's blanket Stop

Cop City policy, prohibiting any meaningful opportunity to review.

B.    On January 28, 2022, approximately sixty (60) protesters walked on the public

trails of Intrenchment Creek in protest of Cop City. Upon encountering law

enforcement, police arrested several protesters and pretextually charged them. A

high-ranking officer ordered and ratified the arrests and charges, pursuant to

Defendant Atlanta's blanket Stop Cop City policy, prohibiting any meaningful

opportunity to review.

C.    On May, 14, 2022, a number of Stop Cop City protesters were arrested in Inman

Park and pretextually charged with several offenses. Approximately fifteen (15)

individuals were seemingly randomly grabbed and arrested in the public park, in

furtherance of Defendant Atlanta's policy, and resulting in a civil case pending before this Court. Jordan Streiff v. City of Atlanta et al., 1:24-cv-02118-LMM (N.D. Ga.). A high-ranking officer ordered and ratified these decisions, pursuant to Defendant Atlanta's blanket Stop Cop City policy, prohibiting any meaningful opportunity to review.

D.  During the above May 14, 2022, Stop Cop City protest, a reporter was unlawfully detained and transported to jail after being deemed to be part of the protest. Before releasing him, police confiscated the reporter's notebook, resulting in a civil case pending before this Court. Ryan Seal v. City of Atlanta et al., 1:24-cv-02117-LMM (N.D. Ga.). A high-ranking officer ordered and ratified the search and seizure, pursuant to Defendant Atlanta's blanket Stop Cop City policy, prohibiting any meaningful opportunity to review.

E.  After the above May 14, 2022, protest, three individuals walking home were selectively stopped for carrying Stop Cop City signs. Under the orders of Defendant Cantin, the individuals were arrested and pretextually charged, resulting in civil cases pending before this Court. Ashley Dixon v. City of Atlanta et al., 1:24-cv-02061-JPB (N.D. Ga.) (consolidated with Melanie Silverstein v. City of Atlanta et al., 1:24-cv-0205). As explained, a high-ranking officer ordered and ratified this decision, pursuant to Defendant Atlanta's blanket Stop Cop City policy, prohibiting any meaningful opportunity to review.

F.  On May 17, 2022, officers from multiple law enforcement agencies, including GBI, conducted a sudden raid of a Stop Cop City encampment in the Weelaunee

Forest. Defendants Long and Carter coordinated this raid under the direction of high APD officials, including Defendants Bruce, Cantin, and Harper. Pursuant to the Stop Cop City policy, the officers arrived with the instruction of arresting everyone in or around the Weelaunee Forest. Accordingly, officers arrested several people lawfully present in the public parking lot of Intrenchment Creek Park, issuing pretextual criminal charges against them. Likewise, officers stopped and interrogated any individual who was close to the public parking lot, regardless of a lack of reasonable suspicion of any criminal offense. As explained, a high-ranking officer ordered and ratified these decisions, pursuant to Defendant Atlanta's blanket Stop Cop City policy, prohibiting any meaningful opportunity to review.

G.    On May 22, 2022, a group of individuals was present in the Weelaunee Forest, with no indication that they were protesters in opposition to Cop City. Regardless of the circumstances, given the Stop Cop City policy, law enforcement quickly chased the individuals down, deeming them to be part of a Stop Cop City protest merely because of their presence. Immediately thereafter, law enforcement arrested and pretextually charged two other individuals nearby. A high-ranking officer ordered and ratified this decision, pursuant to Defendant Atlanta's blanket Stop Cop City policy, prohibiting any meaningful opportunity to review.

H.    On June 7, 2022, APD officers stopped a vehicle they suspected to have been present at previous Stop Cop City protests. Utilizing pretextual criminal charges, the officers arrested the driver. A high-ranking officer ordered and ratified this

decision, pursuant to Defendant Atlanta's blanket Stop Cop City policy, prohibiting any meaningful opportunity to review.

I.      On June 15, 2022, a reporter was walking on the open trails of Intrenchment Creek Park, covering the Stop Cop City protests. Under the orders of Defendants Cantin and Carter, who had been empowered by APD's Chief, officers pretextually seized the journalist and threatened him with criminal charges, resulting in a civil case pending before this Court. Michael Watchulonis v. City of Atlanta et al., 1:23-cv-02204-TCB (N.D. Ga.). As explained, a high-ranking officer ordered and ratified this decision, pursuant to Defendant Atlanta's blanket Stop Cop City policy, prohibiting any meaningful opportunity to review.

J.      On July 22, 2022, officers arrested without grounds a group of people after approximately fifty (50) protesters participated in a public Stop Cop City rally at Georgia State University. Defendant Bruce ordered that the officers issue pretextual charges, resulting in civil cases pending before this Court. Sophia Aira v. City of Atlanta et al., 1:24-cv-03344-TRJ (N.D. Ga.) (consolidated with Gina Dickhaus v. City of Atlanta et al., 1:24-CV-3345-MHC; Laura Leckert v. City of Atlanta et al., 1:24-cv-03346-MHC; Gillian Maurer v. City of Atlanta et al., 1:24-CV- 03347-MHC; Melanie Noyes v. City of Atlanta et al., 1:24-CV- 03348-MHC; Abby Walter v. City of Atlanta et al., 1:24-CV-03349- MHC). As explained, a high-ranking officer ordered and ratified the charges pursuant to Defendant Atlanta's blanket Stop Cop City policy, prohibiting any meaningful opportunity to review.

K.      On December 13, 2022, officers from multiple law enforcement agencies,

including GBI, conducted a sudden raid of a Stop Cop City encampment in the

Weelaunee Forest. Defendants Long and Carter coordinated this raid under the

direction of high APD officials, including Defendants Bruce, Cantin, and Harper.

Pursuant to the Stop Cop City policy, the officers arrived with the instruction of

arresting everyone in or around the Weelaunee Forest. Accordingly, officers

arrested several people present at Intrenchment Creek Park, issuing pretextual

criminal charges against them. Likewise, officers arrested and issued pretextual

charges against someone who was lawfully driving on Key Road around the time

of the raid. As explained, a high-ranking officer ordered and ratified these

decisions, pursuant to Defendant Atlanta's blanket Stop Cop City policy,

prohibiting any meaningful opportunity to review.

L.      On December 15, 2022, during a meeting of the Atlanta Police Foundation's

Community Stakeholder Advisory Committee, APD Assistant Chief Carven Tyus

announced that Defendant Atlanta's policy would now include charging Stop Cop

City protesters with Domestic Terrorism, apparently regardless of the underlying

facts or circumstances, and particularly if the perceived protester is not a Georgia

resident. One Committee member praised APD's "shock and awe" response,

clearly alluding to the blanket Stop Cop City policy.[9] Accordingly, the December

13 raid's arrestees were charged with this unprecedented offense. This decision

---

[9] Ryan Fatica, 'Community' Committee Cheers Police Violence as Authorities Repress Resistance to 'Cop City', Unicorn Riot, Feb. 24, 2023 (accessed Feb. 21, 2025 at https://unicornriot.ninja/2023/community-committee-cheers-police-violence-as-authorities-repress-resistance-to-cop-city/).

came from the highest ranking official, APD Chief Darin Schierbaum, prohibiting

any meaningful opportunity to review.

M.    On January 18, 2023, officers from multiple law enforcement agencies, including

GBI, conducted a yet another sudden raid of a Stop Cop City encampment in the

Weelaunee Forest. Defendants Long and Carter coordinated this raid under the

direction of high APD officials, including Defendants Bruce, Cantin, and Harper.

Pursuant to the Stop Cop City policy, the officers arrived with the instruction of

arresting everyone in or around the Weelaunee Forest. Accordingly, officers

arrested several people present at Intrenchment Creek Park, issuing pretextual

criminal charges against them, now including Domestic Terrorism. During this

joint operation, officers shot and killed Tortuguita, resulting in a civil case

pending before this Court. Joel Paez & Belkis Teran v. Ryan Long et al., 1:24-cv-

05780 (N.D. Ga.). As explained, a high-ranking officer ordered and ratified these

decisions, pursuant to Defendant Atlanta's blanket Stop Cop City policy,

prohibiting any meaningful opportunity to review.

N.    On June 30, 2023, APD officers arrested and pretextually charged two Stop Cop

City protesters at a peaceful rally at Midtown's Home Depot, a financial supporter

of the Atlanta Police Foundation. A high-ranking officer ordered and ratified the

arrests and charges, pursuant to Defendant Atlanta's blanket Stop Cop City

policy, prohibiting any meaningful opportunity to review.

O.    On December 22, 2023, officers arrested and pretextually charged three Stop Cop

City protesters participating in a peaceful and lawful public rally outside of the

Cop City construction site, as part of a weekly protest called "Forest Fridays." A high-ranking officer ordered and ratified the arrests and charges, pursuant to Defendant Atlanta's blanket Stop Cop City policy, prohibiting any meaningful opportunity to review.

33.  These fifteen (15) non-isolated incidents are non-exhaustive examples of the creation and execution of Defendant Atlanta's Stop Cop City policy: in DeKalb County alone, there are over one hundred (100) documented misdemeanor charges against perceived Stop Cop City protesters.

### *LAW STUDENT PLAINTIFF ATTENDS MUSIC FESTIVAL AT PUBLIC PARK*

34.  Plaintiff has no past criminal convictions.

35.  Plaintiff is a non-binary, gender nonconforming individual.

36.  Throughout their life, Plaintiff has been outspoken against intersecting issues of mass incarceration, police violence, racism, transphobia, and climate change.

37.  At the time of Tortuguita's death on January 2023, Plaintiff was a young law student at the competitive University of North Carolina School of Law ("Carolina Law").

38.  During their 2L 2023 spring semester, Plaintiff learned through social media of Tortuguita's death and the South River Music Festival taking place at the public park in Atlanta.

39.  Taking advantage of their spring break, Plaintiff traveled to Atlanta in their vehicle to attend the music festival, located right where Tortuguita had been killed.

40.  Plaintiff intended to return to North Carolina and resume their studies after the music festival and planned accordingly.

41.    On March 4, 2023, Plaintiff drove in their vehicle to the public Intrenchment Creek Park, in the Weelaunee Forest, located in Atlanta, on DeKalb County.

42.    On March 4, in the public park, Plaintiff was surrounded by hundreds of strangers and newly made friends.

43.    Throughout March 4, Plaintiff enjoyed the music, dancing, art, food, and political expressions in opposition to Cop City and in remembrance of Tortuguita's death.

44.    Throughout March 4, Plaintiff noticed some law enforcement presence, but they were solely observing the music festival from afar. Plaintiff saw no signage or government action indicating that the gathering was prohibited or unlawful in any way.

45.    Late in the evening of March 4, Plaintiff walked to their vehicle and left the music festival for the night, with no interaction with law enforcement.

46.    On the morning of March 5, 2023, Plaintiff drove their vehicle back to the same public park they had been at the previous day. They continued enjoying the activities of the festival, alongside hundreds of others.

47.    Throughout the day of March 5, Plaintiff noticed a helicopter flying around the music festival. Again, Plaintiff saw no signage or government action indicating that the gathering was prohibited or unlawful in any way.

48.    Sometime in the afternoon of March 5, miles away from the location of the music festival, unidentified individuals set construction equipment of Cop City on fire.

**MARCH 5, 2023, JOINT OPERATION UNDER STOP COP CITY POLICY**

49.    Some hours after the fire, hundreds of law enforcement officers of multiple Georgia agencies – Defendant Officers – suddenly and aggressively descended on the music

festival. Defendants Long, Carter, Reed, Thomas, Bruce, Cantin, and Harper were among these officers.

50.    Pursuant to Defendant Atlanta's Stop Cop City policy, Defendants Long and Carter coordinated this joint operation with Defendant Officers, on-duty officers of multiple law enforcement agencies, including GBI, APD, DNR, GSP, Fulton County Police Department ("FPD"), and DeKalb County Police Department ("DKPD").

51.    Defendants Long and Carter acted under the direction of high APD officials, including Defendants Bruce, Cantin, and Harper, as well as Chief Darin Schierbaum.

52.    By design and in execution, the March 5 raid paralleled the above-explained joint operations of May 17, 2022; December 13, 2022; and January 18, 2023.

53.    The joint operation to indiscriminately arrest and pretextually charge festival attendees was in direct enforcement of Defendant Atlanta's Stop Cop City policy, following the same pattern, policy, and custom of prior raids in the Weelaunee Forest.

54.    All of Defendant Officers arrived to the music festival with the understanding that attendees should be arrested. Defendants Reed and Thomas knew of this agreement.

55.    Defendant Officers knew of Defendant Atlanta's Stop Cop City policy and acted pursuant to its mandate at all times.

56.    Accordingly, under the supervision and coordination of Defendants Long, Carter, Bruce, Cantin, and Harper, Defendant Officers suddenly ordered all people present at the public park to disperse and leave.

57.    Immediately after making dispersal orders, and pursuant to the plan coordinated by Defendants Long and Carter under Defendant Atlanta's Stop Cop City policy,

Defendant Officers commenced mass arrests, regardless of the underlying facts or circumstances. Festival attendees reasonably began fleeing the area in panic.

58.    Defendants Long, Carter, Bruce, Cantin, and Harper were present in the public park during the mass arrest, actively coordinating the operation with Defendant Officers, including Defendants Reed and Thomas.

### *PLAINTIFF'S SUDDEN ARREST AND DETENTION*

59.    Plaintiff was having early dinner in the public park when Defendant Officers arrived.

60.    Plaintiff did not have wet clothes.

61.    Plaintiff did not have muddy clothes from breaching and crossing an embankment.

62.    Plaintiff could not be trespassing on the public Intrenchment Creek Park.

63.    Plaintiff did not possess a shield.

64.    Plaintiff did not have incendiary devices or explosives residue.

65.    Plaintiff did not have rocks, fireworks, or Molotov cocktails.

66.    Plaintiff did not have the phone number of the "Atlanta Solidarity Fund Jail Support Line" in their clothing or written on their person.

67.    Plaintiff was miles and hours away from the fire.

68.    Plaintiff was a legitimate attendee of the music festival at the public park, as hundreds of many others around them.

69.    In response to Defendant Officers' dispersal orders, directed by Defendants Long, Carter, Bruce, Cantin, and Harper, Plaintiff began leaving the public park towards their parked vehicle.

70.     On the ground, Defendant Thomas was accompanying and giving directions to Defendant Reed.

71.     Suddenly and without warning, while it was still daytime, Defendant Reed, in furtherance of the agreement with the other defendants, and in concert with Defendant Thomas, tackled Plaintiff and placed them in handcuffs. After quickly completing the arrest, and reflective of Defendants' joint operation's goals, Defendant Reed exclaimed to Defendant Thomas and other officers, "I got one!"

72.     By foot, Defendants Reed and Thomas escorted Plaintiff from the place of their arrest to where other people arrested without a warrant were being gathered, sitting on the muddy ground somewhere in the public park.

73.     In furtherance of their prior agreement, Defendants Reed and Thomas transferred custody of Plaintiff to Defendant Officers, supervised by Defendants Carter, Long, Bruce, Cantin, and Harper.

74.     After being escorted and sat down with dozens of other legitimate festival attendees, Plaintiff never saw Defendants Reed or Thomas again.

75.     On site, Defendant Officers took each arrestee to be interviewed one at at time, under the coordination of Defendants Long, Carter, Bruce, Cantin, and Harper.

76.     At the public park, DeKalb County Assistant District Attorney Lance Cross ("Mr. Cross") interviewed Plaintiff and other arrestees, while Deputy Attorney General John Fowler ("Mr. Fowler") interviewed the rest of the arrestees.

77.    Plaintiff provided their identification to Mr. Cross and immediately invoked their right to remain silent and asked for an attorney. Knowingly asserting their Fifth and Sixth Amendment rights, and remaining silent throughout, Plaintiff signed a form.

78.    After the interviews, under the coordination of Defendants Long, Carter, Bruce, Cantin, and Harper, Defendant Officers instructed Georgia residents to move to a separate area at the public park. Voluntarily, a number of Georgia residents followed the instructions.

79.    Plaintiff and many other arrestees got up and sat elsewhere in the public park, separately from the self-identified Georgia residents.

80.    Defendant Officers released all Georgia residents, except for two. Defendant Officers did not release any non-Georgia resident.

81.    Defendant Officers transported Plaintiff and the many other remaining arrestees to DeKalb County Jail for booking and processing, advancing Defendant Atlanta's Stop Cop City policy.

82.    Plaintiff was not informed under what criminal charges they were being held.

83.    Plaintiff was detained overnight in the DeKalb County Jail's holding room with no ability to communicate with the outside world until the following morning.

### *DEKALB COUNTY WARRANT AND INCARCERATION*

84.    In coordination with Defendant Officers, and in communication with Defendant Carter, the next day, on March 6, 2024, at or around 3:00 p.m., Defendant Long sought an arrest warrant against Plaintiff from a DeKalb County Magistrate, based on an

alleged violation of O.C.G.A. § 16-11-220, Domestic Terrorism, through an Affidavit.[10]

85.    Defendants' pursuit of the pretextual Domestic Terrorism criminal accusations against Plaintiff was in advancement of Defendant Atlanta's Stop Cop City policy.

86.    Defendants knew that Defendant Long's Affidavit and Defendants' accusations against Plaintiff were not based on fact or tangible evidence.

87.    Despite not being the arresting officer, Defendant Long was the sole affiant and witness for Plaintiff's arrest warrant.

88.    Defendant Long, in direct coordination with Defendant Carter, sought and obtained an arrest warrant for the same offense against twenty-two (22) other arrestees from the previous night.

89.    All twenty-three (23) arrest warrant Affidavits are identical, except for five (5), which do not have a "Probable Cause" section.

90.    In Plaintiff's arrest warrant's Affidavit's Probable Cause section, the only particularized allegations against Plaintiff are the following:

   A.    "The accused was observed with muddy clothing from breaching and crossing the embankment;" and

   B.    "Accused was also in possession of a shield."

91.    All other generalized allegations in the Affidavit's Probable Cause section were based on information "collected by statements, interviews, social media posts, and videos."

---

[10] **Exhibit A,** DeKalb County Affidavit and Arrest Warrant.

92.     Based on Defendant Long's vague and false Affidavit, Magistrate T.L. Thompson

issued an arrest warrant against Plaintiff for a violation of O.C.G.A. § 16-11-220,

Domestic Terrorism, giving rise to DeKalb County case D0293186.

93.     The issued arrest warrant kept Plaintiff incarcerated in the deadly DeKalb County Jail.

94.     Plaintiff maintains their innocence in the DeKalb County case.

95.     On March 7, 2023, a DeKalb County Magistrate Judge denied Plaintiff's bond.

96.     The State, through the DeKalb County District Attorney's Office, refused to consent to

a bond for Plaintiff, despite the State consenting to bond for several co-defendants.

The State explained to Plaintiff, through their counsel, that this was in large part due to

statements made by a Charlotte-Mecklenburg Police Department major.

97.     Selectively, the State offered consent bonds to some co-defendants. Plaintiff and other

co-defendants were informed that they would receive a consent bond only if they

agreed to give a proffer to the State. Accordingly, some co-defendants received

consent bonds, while others' bonds, including Plaintiff's, were strongly opposed.

### *DEKALB COUNTY BOND*

98.     On March 23, 2023, Plaintiff had a bond hearing in DeKalb County Superior Court.

99.     During the bond hearing, the State, through Mr. Cross, relayed that a Charlotte-

Mecklenburg Police Department major stated that Plaintiff was one million percent

likely to commit future felonies, was a known anarchist who had funded local

programs, and had a reputation for having violent confrontations with police officers,

which is why the State would oppose any bond.

100.    The major's statements were verifiably false.

101.    During the bond hearing, defense counsel of a co-defendant stated in open court that a prosecutor confirmed that the allegation of defendants possessing a shield was "a typo."

102.    Judge Gregory A. Adams granted Plaintiff a secured bond in the amount of $25,000.00, with the following bond conditions: do not communicate with any co-defendant; stay away from Georgia; turn over their U.S. passport to their attorney for withholding; and remain on an ankle monitor. Plaintiff posted bond and was released.

103.    The DeKalb County case remains unindicted, and hence unchallengeable.

104.    In the summer of 2023, the DeKalb County District Attorney's Office abandoned the case, noting concerns over sufficiency of the evidence[11] and leaving it in the hands of the Attorney General's Office, led by a chief belligerent in the political fight over the future of the Weelaunee Forest.[12]

105.    On March 1, 2024, Plaintiff made a formal demand for a speedy trial and prosecution, under Ga. Const. art. I, § I, para. XI and U.S. Const. amend. VI (Speedy Trial), as well as Ga. Const. art. I, § I, para. I and U.S. Const. amend. V and XIV (Due Process).

### *FULTON COUNTY INDICTMENT*

106.    While the DeKalb County case remains unindicted, on August 29, 2023, the Attorney General's Office indicted Plaintiff in a separate Fulton County case for a violation of

---

[11] R.J. Rico, Prosecutor quits 'Cop City' cases over disagreements with Georgia attorney general, Associated Press, Jun. 23, 2023 (accessed Feb. 21, 2025, at https://apnews.com/article/cop-city-domestic-terrorism-charges-atlanta-bae860067e0a90472bc05b55c5cfc123).

[12] Fox 5 Atlanta Digital Team, Attorney General joins Atlanta in battle over public safety training center petition, Fox 5, July 21, 2023 (accessed Feb. 21, 2025 at https://www.fox5atlanta.com/news/attorney-general-cop-city-atlanta-petition-lawsuit).

O.C.G.A. § 16-14-4(c), conspiracy under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, Fulton County Case 23SC189192.[13]

107.    Under the direction of Defendants Long and Carter, Defendant Officers actively participated in this broader investigation and separate prosecution.

108.    Plaintiff is not a part of the non-existent "Defend the Atlanta Forest" criminal enterprise.

109.    On March 5, 2023, Plaintiff was not trespassing on the public Intrenchment Creek Park.

110.    On March 5, 2023, Plaintiff did not join an organized mob of individuals to overwhelm law enforcement to occupy the DeKalb forest and cause property damage.

111.    Defendants knew their accusations against Plaintiff were not based on fact or tangible evidence.

112.    Defendant Long was the sole listed witness for the Fulton County grand jury that indicted Plaintiff and others.

113.    Defendant Long knew he was providing testimony related to Plaintiff that was not based on fact or tangible evidence.

114.    Defendants' pursuit of additional pretextual criminal accusations against Plaintiff was in advancement of Defendant Atlanta's Stop Cop City policy.

115.    The overreaching 109-page indictment mentions Plaintiff only three times under the factual allegations of "Count 1 – Racketeering:"

---

[13] **Exhibit B**, Relevant Excerpts of Indictment.

A. "(169) On or about March 5, 2023 . . . , [Plaintiff and others] did commit a Criminal Trespass in an attempt to further the occupation the DeKalb forest. This is an overt act in furtherance of the conspiracy."

B. "(191) On or about March 5, 2023, [Plaintiff] did join an organized mob of individuals designed to overwhelm the police force in an attempt to occupy the DeKalb forest and cause property damage. This is an overt act in furtherance of the conspiracy."

C. "(215) On or about March 5, 2023, [Plaintiff] did join an organized mob and succeeded in overwhelming the police force, thereby aiding and abetting in the offense of Arson and Domestic Terrorism in an attempt to occupy the DeKalb forest and prevent the building of the Atlanta Public Safety Training Center. This is an overt act in furtherance of the conspiracy."

116. The allegations against Plaintiff in Fulton County stem from those in the DeKalb County arrest warrant, which was a consequence of Defendant Reed's arrest and Defendant Atlanta's Stop Cop City policy.

117. Plaintiff maintains their innocence in the Fulton County case.

118. Plaintiff never received personal notice or service of the Fulton County indictment.

119. The Attorney General's Office obtained an arrest warrant against Plaintiff based on the Fulton County indictment, which Plaintiff learned about through their counsel.

120. On November 7, 2024, Plaintiff traveled to Atlanta to appear at their Fulton County arraignment and respond to the new arrest warrant.

121. The State, through the Attorney General's Office, consented to a $25,000.00 bond with several restrictions. Judge Kimberly Adams entered a corresponding bond order.

122. In the early morning of November 8, 2024, Plaintiff turned themselves in for booking and processing at the deadly Fulton County Jail.

123. Plaintiff posted bond and was released over a day later, having to spend a night in the holding cell of the deadly Fulton County Jail.

124. Plaintiff, through counsel, has filed numerous notices and motions on the pending Fulton County case. Over a year later, and now in front of a third judge, there have been no substantive hearings on Plaintiff's notices or motions.

125. The root of Defendants' accusations against Plaintiff are entirely based on Defendant Reed's arrest, which allegedly informed Defendant Long's false Affidavit in DeKalb County and false sworn testimony to the Fulton County grand jury.

126. While all of the criminal cases associated with this matter are still pending at the time of the filing of this Complaint, Plaintiff reasonably expects that the criminal cases will be formally and favorably resolved.

### *HARMS SUFFERED DUE TO DEFENDANTS' ACTIONS*

127. Due to Defendants' shocking accusations that Plaintiff is a domestic terrorist and part of a RICO conspiracy, Plaintiff's personal and professional relationships have been forever tarnished; has faced difficulties finding employment due to background checks; difficulties securing housing due to background checks; and have the threat of decades in prison lingering over their daily life.

128.    Due to Defendants' infirm arrest warrant, for over three (3) weeks, Plaintiff was

incarcerated in DeKalb County Jail. Plaintiff's incarceration resulted in disciplinary

action from Carolina Law, physical and psychological harms, financial loss, and

prolonged and ongoing distress.

129.    Due to Defendants' infirm arrest warrant, for over three (3) months, from release until

their DeKalb County bond conditions were modified on June 20, 2023, Plaintiff was

on an ankle monitor in North Carolina. Plaintiff had to endure the stigma and physical

impact of wearing an ankle monitor, resulting in mental and physical harms. In

addition, Plaintiff had to pay a recurring fee to the ankle monitor company.

130.    Due to Defendants' infirm arrest warrant, for approximately nineteen (19) months,

from release until the conditions were modified on November 12, 2024, Plaintiff was

banned from Georgia, had their U.S. passport confiscated, and had to call the DeKalb

Pretrial Services at least once a week to keep them updated of all their personal

information. Plaintiff's fundamental right to travel was harmed, and, as a result,

Plaintiff was unable to go to a competitive study abroad law school program in Spain

during their 3L 2024 fall semester, impacting their education and professional future.

131.    Due to Defendants' infirm indictment, Plaintiff was forced to spend over a day in the

deadly Fulton County Jail, resulting in physical and psychological harms, financial

loss, and prolonged and ongoing distress.

132.    Due to the unprecedented criminal accusations and resulting injurious statements made

against Plaintiff, Carolina Law banned Plaintiff from being physically present on the

school's premises, directly affecting Plaintiff's education, reputation, finances, and

psychological well-being. Plaintiff's ban from their school's campus was renewed every semester given that the cases remained pending through 2023 and 2024.

133.    Plaintiff completed their legal education through remote classes and graduated on May 2024. However, due to the unsubstantiated criminal accusations in DeKalb and Fulton County, it is unclear whether Plaintiff will be allowed to obtain a North Carolina bar license, impacting their professional career and financial future.

134.    Due to the charges, right-wing websites and social media accounts have created defamatory articles and stories about Plaintiff, exposing their personal information to the world ("doxing"), resulting in severe mental harms to Plaintiff. In addition, due to the impact of incarceration and the serious felony charges they're facing, Plaintiff has been extremely emotionally and psychologically affected. As a result of these facts, they are under the continuous care of a licensed mental health professional.

135.    Due to the pending case in Fulton County, Plaintiff has been forced to suddenly travel to Atlanta several times, impacting their finances and ability to maintain employment.

136.    Due to the pending case in Fulton County, Plaintiff must regularly provide updates on all their personal information to Fulton Pretrial Services.

137.    All of Plaintiff's harms are directly traceable and a result of Defendant Atlanta's Stop Cop City policy, which has harmed other innocent individuals who have been deemed to be in opposition to Defendant Atlanta's Cop City.

**COUNT I**
**DEPRIVATION OF CIVIL RIGHTS**
**BY UNLAWFUL SEIZURE AND DETENTION**
**UNDER 42 U.S.C. § 1983**
**Against All Defendants Except City of Atlanta**

138.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in

paragraphs 1 through 137 above.

139.    The Fourth Amendment protects individuals from unlawful seizures and detentions.

140.    Defendants are government agents who, during all times and while committing every

action described in this Complaint, were each acting under the authority granted by

Georgia law enforcement agencies, and therefore were acting under the color of law.

141.    Defendant Reed, in concert with all Defendants and under the direct coordination of

Defendants Long, Carter, Bruce, Cantin, and Harper, arrested Plaintiff without

probable cause, because, based on Defendants' knowledge and reasonably

trustworthy information at that time, no reasonable officer would have found

sufficient facts or circumstances to conclude that Plaintiff had committed or was

committing a criminal offense. Specifically, Plaintiff was located hours and miles

away from the fire at the construction site; was not trespassing; did not have wet

clothes; was fully visible in the daytime; did not have muddy clothes from breaching

and crossing an embankment; did not possess a shield; did not have rocks, fireworks,

or Molotov cocktails; did not have the phone number of the "Atlanta Solidarity Fund

Jail Support Line" in their clothing or written on their person; and was a legitimate

attendee of the music festival at the public park.[14]

---

[14] "If a plaintiff files a false-arrest claim before he has been convicted (or files any other claim related to rulings that will likely be made in a pending or anticipated criminal trial), it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended." Wallace v. Kato, 549 U.S. 384, 393-94, 127 S. Ct. 1091, 1098 (2007); see also Watts v. Epps, 475 F. Supp.

142.    Defendant Reed's unlawful arrest was made without legal process, that is, an arrest warrant.

143.    Defendants, under the coordination of Defendants Long, Carter, Bruce, Cantin, and Harper, released multiple arrestees after dozens of warrantless arrests in the area. Yet they continued to detain Plaintiff without probable cause for hours at the public park and then overnight at DeKalb County Jail. The only difference between the released arrestees and Plaintiff was that Plaintiff was not a Georgia resident, and this is not sufficient to warrant a reasonable officer to believe that an offense has been or is being committed.

144.    Defendants' subsequent DeKalb County arrest warrant was infirm, because Defendant Long, in concert with Defendants and in coordination with Defendant Carter, intentionally and recklessly made false statements and omissions in his Affidavit, and the Affidavit lacked sufficient probable cause for a legal process under O.C.G.A. § 16-11-220. Even without the misstatements and omissions, there were clearly insufficient facts to support probable cause for an arrest warrant.

145.    Defendants violated Plaintiff's clearly established constitutional rights, because no officer could have reasonably believed that probable cause existed that a criminal offense was committed, in light of the information the officers possessed, and this requirement for an arrest and detention was clearly established well before 2023. Yet Defendants arrested and detained Plaintiff.

---

2d 1367, 1369 (N.D. Ga. 2007) ("[I]t is the issuance of a stay--and not the tolling of an action--that is the appropriate prophylactic device to prevent federal courts from undercutting state criminal convictions by preordaining in § 1983 actions the constitutionality of arrests or seizures."), Hannah Kass v. Lt. Ramirez et al., 1:24-cv-02095-TRJ at DE 23 (N.D. Ga.) (granting Joint Motion to Stay, based on similarly pending criminal charges).

146.  As a result of Defendants' unlawful arrest and detention, Plaintiff was held in DeKalb County Jail for over three (3) weeks.

147.  As a result of Defendants' unlawful arrest, Plaintiff was indicted in Fulton County.

148.  Defendants' actions have directly and proximately caused significant damages to Plaintiff, including, but not limited to, being publicly broadcast to the world as a "domestic terrorist" and "RICO co-conspirator," forever tarnishing Plaintiff's personal and professional life; difficulty finding employment; difficulty securing housing; mental distress at having decades in prison lingering over their daily life; three (3) weeks of incarceration at the deadly DeKalb County Jail; physical, psychological, financial, and ongoing mental harms due to the prolonged incarceration; mental, physical, and financial harms due to the ankle monitor they were forced to wear for three (3) months, as well as reputational harms from the accompanying stigma; a deprivation of their fundamental right to travel due to the ban from Georgia and confiscation of their U.S. passport for nineteen (19) months, as well as loss of opportunity and harms to their education and professional future due to the inability to participate in a competitive international study abroad program; mental and physical harms from having to report to DeKalb Pretrial Services once a week for nineteen (19) months; over a day of incarceration at the deadly Fulton County Jail; physical, psychological harms, financial loss; and ongoing mental harms due to the incarceration; a physical ban from Carolina Law, directly affecting Plaintiff's education, reputation, finances, and psychological well-being; an impact on Plaintiff's ability to obtain a North Carolina bar license, harming their professional

career and financial future; extreme emotional and psychological effects due to foreseeable right-winger doxing, incarceration, and the serious felony charges they're facing, requiring the continuous care of a licensed mental health professional; financial and employment harms due to the travel requirements of the pending Fulton County case; mental and physical harms from having to regularly report to Fulton Pretrial Services; and all consequential damages flowing from these harms, including attorney fees and other legal expenses.

149.    An evil motive and intent can be reasonably inferred from Defendants' intentional misstatements and omissions when they initiated criminal prosecutions against Plaintiff.

150.    Defendants were recklessly and callously indifferent to Plaintiff's federally protected rights, because they intentionally seized and detained Plaintiff despite lacking sufficient underlying facts, taking affirmative steps to violate Plaintiff's Fourth Amendment rights. Defendants had numerous opportunities to release Plaintiff and stop the pursuit of the criminal charges, as they did with other seized-and-released festival attendees, yet they continued their unconstitutional actions against Plaintiff.

WHEREFORE, Plaintiff demands judgment and compensatory, consequential, and punitive damages against Defendants Special Agent Ryan Long, Special Agent Michael Carter, Game Warden Quintin Reed, Trooper Cl. Thomas, Deputy Chief Jessica Bruce, Major Jeff Cantin, Deputy Chief Gary Harper, and John and Jane Doe's 1-100; and, in addition, demands attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988. Plaintiff demands trial by jury on all issues so triable.

### COUNT II
### DEPRIVATION OF CIVIL RIGHTS
### BY FIRST AMENDMENT RETALIATION
### UNDER 42 U.S.C. § 1983
### Against All Defendants Except City of Atlanta

151.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 137 above.

152.    The First Amendment protects the right of individuals to engage in protected speech free from government retaliation.

153.    Defendants are government agents who, during all times and while committing every action described in this Complaint, were each acting under the authority granted by Georgia law enforcement agencies, and therefore were acting under the color of law.

154.    On March 5, 2023, Plaintiff was engaged in constitutionally protected speech. Specifically, Plaintiff was a legitimate attendee at a two-day political music festival in a public park in Atlanta, which expressed opposition to a well-known, city-funded project and outrage at the death of Tortuguita at the hands of law enforcement agents. Through Plaintiff's conduct and actions, they were engaging in speech about a matter of public concern, speech through expressive conduct, and political speech. Plaintiff and many others around them had been engaged in this speech for a full day already.

155.    Defendants retaliated against Plaintiff's protected speech by suddenly and violently raiding the music festival and performing an indiscriminate mass arrest of legitimate festival attendees, including Plaintiff, due to the content of the music festival's speech, that is, opposition to Cop City and outrage at the death of Tortuguita at the hands of law enforcement agents.

156.    Defendants retaliated against Plaintiff's protected speech by unlawfully and wrongfully seizing, detaining, and prosecuting Plaintiff due to their participation and expression at the free, political music festival in the public park.

157.    Defendants' retaliatory conduct adversely affected Plaintiff's protected speech, because, by aggressively shutting down the entire music festival and unlawfully arresting legitimate attendees, including Plaintiff, Defendants caused for any person of ordinary firmness to be deterred in exercising their First Amendment rights, that is, attending a free, political music festival at this public park in Atlanta, as well as expressing public opposition to Cop City and outrage at the death of Tortuguita. Indeed, due to Defendants' actions, festival attendees fled the public park in panic.

158.    Defendants' retaliatory animus for their actions was based on their desire to completely quash opposition to the Cop City project and silence the outrage at the death of Tortuguita, and this animus actually and proximately caused Plaintiff's injuries, that is, being silenced in their political speech; unlawfully seized; unlawfully detained in jail for three weeks; and wrongfully prosecuted under two felony cases in two different counties in Georgia.

159.    But-for Defendants' retaliatory conduct against Plaintiff's protected speech – unlawfully and wrongfully seizing, detaining, and prosecuting Plaintiff – Plaintiff would not have suffered the foreseeable injuries that Defendants intended to cause – silencing Plaintiff's speech and right to petition.

160.    Further showing the causation link between Defendants' animus and Plaintiff's injury, Defendants lacked probable cause for the retaliatory arrest and prosecution

they committed against Plaintiff, because, at the time of the seizure, no reasonable

officer could conclude that there was a substantial chance of criminal activity, to wit,

Plaintiff was located hours and miles away from the fire at the construction site; was

not trespassing; did not have wet clothes; was fully visible in the daytime; did not

have muddy clothes from breaching and crossing an embankment; did not possess a

shield; did not have rocks, fireworks, or Molotov cocktails; did not have the phone

number of the "Atlanta Solidarity Fund Jail Support Line" in their clothing or written

on their person; and was a legitimate attendee of the music festival at the public

park.[15]

161.    Defendants arrested Plaintiff without an arrest warrant, making the retaliatory arrest

presumptively unreasonable under the First Amendment.

162.    Moreover, the DeKalb County arrest warrant Affidavit prepared by Defendant Long,

in concert with all Defendants, possessed intentional and reckless misstatements and

omissions, because Plaintiff was located hours and miles away from the fire at the

construction site; was not trespassing; did not have wet clothes; was fully visible in

the daytime; did not have muddy clothes from breaching and crossing an

embankment; did not possess a shield; did not have rocks, fireworks, or Molotov

cocktails; did not have the phone number of the "Atlanta Solidarity Fund Jail Support

Line" in their clothing or written on their person; and was a legitimate attendee of the

---

[15] "If a plaintiff files a false-arrest claim before he has been convicted (or files any other claim related to rulings that will likely be made in a pending or anticipated criminal trial), it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended." Wallace v. Kato, 549 U.S. 384, 393-94, 127 S. Ct. 1091, 1098 (2007); see also Watts v. Epps, 475 F. Supp. 2d 1367, 1369 (N.D. Ga. 2007) ("[I]t is the issuance of a stay--and not the tolling of an action--that is the appropriate prophylactic device to prevent federal courts from undercutting state criminal convictions by preordaining in § 1983 actions the constitutionality of arrests or seizures."), Hannah Kass v. Lt. Ramirez et al., 1:24-cv-02095-TRJ at DE 23 (N.D. Ga.) (granting Joint Motion to Stay, based on similarly pending criminal charges).

music festival at the public park. In addition, Defendant Long, in concert with all

Defendants, intentionally and recklessly made misstatements and omissions to

support his testimony for the Fulton County indictment, because Plaintiff is not a part

of the non-existent "Defend the Atlanta Forest" criminal enterprise; and, on March 5,

2023, Plaintiff was not trespassing on the public Intrenchment Creek Park, nor did

Plaintiff join an organized mob of individuals to overwhelm law enforcement to

occupy the DeKalb forest and cause property damage.

163.    Even without the misstatements and omissions, there were insufficient facts to

support any criminal process, in violation of Plaintiff's clearly established rights.

164.    Plaintiff was differentially arrested, detained, and prosecuted when otherwise

similarly situated individuals not engaged in the same sort of protected speech are

not. Specifically, individuals present at Intrenchment Creek Park and who are not

perceived as being opposition to Cop City are not unlawfully arrested and

pretextually charged. Likewise, Georgia residents who were alongside Plaintiff

expressing opposition to Cop City were either seized and released or not seized at all,

whereas Plaintiff, who expressed speech as a non-resident, was targeted.

165.    A reasonable officer would have known that retaliating against Plaintiff for speech

about a matter of public concern, speech through expressive conduct, and political

speech would be impermissible under the First Amendment, violating Plaintiff's

clearly established rights, because the right to be free of government retaliation

against protected speech was well established before 2023. Yet Defendants retaliated

against Plaintiff's speech.

166.   Defendants' actions have directly and proximately caused significant damages to
       Plaintiff, including, but not limited to, being silenced and punished for their political
       expression; being publicly broadcast to the world as a "domestic terrorist" and "RICO
       co-conspirator," forever tarnishing Plaintiff's personal and professional life; difficulty
       finding employment; difficulty securing housing; mental distress at having decades in
       prison lingering over their daily life; three (3) weeks of incarceration at the deadly
       DeKalb County Jail; physical, psychological, financial, and ongoing mental harms
       due to the prolonged incarceration; mental, physical, and financial harms due to the
       ankle monitor they were forced to wear for three (3) months, as well as reputational
       harms from the accompanying stigma; a deprivation of their fundamental right to
       travel due to the ban from Georgia and confiscation of their U.S. passport for nineteen
       (19) months, as well as loss of opportunity and harms to their education and
       professional future due to the inability to participate in a competitive international
       study abroad program; mental and physical harms from having to report to DeKalb
       Pretrial Services once a week for nineteen (19) months; over a day of incarceration at
       the deadly Fulton County Jail; physical, psychological harms, financial loss; and
       ongoing mental harms due to the incarceration; a physical ban from Carolina Law,
       directly affecting Plaintiff's education, reputation, finances, and psychological well-
       being; an impact on Plaintiff's ability to obtain a North Carolina bar license, harming
       their professional career and financial future; extreme emotional and psychological
       effects due to foreseeable right-winger doxing, incarceration, and the serious felony
       charges they're facing, requiring the continuous care of a licensed mental health

professional; financial and employment harms due to the travel requirements of the

pending Fulton County case; mental and physical harms from having to regularly

report to Fulton Pretrial Services; and all consequential damages flowing from these

harms, including attorney fees and other legal expenses.

167.    An evil motive and intent can be reasonably inferred from Defendants' intentional

misstatements and omissions when they initiated criminal prosecutions against

Plaintiff, as well as their intentional targeting of individuals based on their speech.

168.    Defendants were recklessly and callously indifferent to Plaintiff's federally protected

rights, because they intentionally targeted Plaintiff based on their protected speech,

taking affirmative steps to violate Plaintiff's First Amendment rights.

WHEREFORE, Plaintiff demands judgment and compensatory, consequential, and

punitive damages against Defendants Special Agent Ryan Long, Special Agent Michael Carter,

Game Warden Quintin Reed, Tooper Cl. Thomas, Deputy Chief Jessica Bruce, Major Jeff

Cantin, Deputy Chief Gary Harper, and John and Jane Doe's 1-100; and, in addition, demands

attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988. Plaintiff demands trial by jury

on all issues so triable.

### COUNT III
### DEPRIVATION OF CIVIL RIGHTS
### BY MALICIOUS PROSECUTION
### UNDER 42 U.S.C. § 1983
### Against All Defendants Except City of Atlanta

169.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in

paragraphs 1 through 137 above.

170. The Fourth Amendment protects individuals against malicious prosecutions from government agents.

171. Defendants are government agents who, during all times and while committing every action described in this Complaint, were each acting under the authority granted by Georgia law enforcement agencies, and therefore were acting under the color of law.

172. When Defendant Reed first encountered Plaintiff in the noncosensual encounter in 2023, no reasonable officer would have concluded that criminal activity was afoot based on the specific facts related to Plaintiff, because Plaintiff was located hours and miles away from the fire at the construction site; was not trespassing; did not have wet clothes; was fully visible in the daytime; did not have muddy clothes from breaching and crossing an embankment; did not possess a shield; did not have rocks, fireworks, or Molotov cocktails; did not have the phone number of the "Atlanta Solidarity Fund Jail Support Line" in their clothing or written on their person; and was a legitimate attendee of the music festival at the public park.

173. Despite lacking probable cause, Defendant Reed, in concert with all Defendants, seized and detained Plaintiff, and, consequently, Defendants have knowingly pursued unsupported criminal processes against Plaintiff.

174. Defendants unlawfully seized and prosecuted Plaintiff in violation of the Fourth Amendment, because their warrantless arrest of Defendant lacked probable cause; their DeKalb County arrest warrant affidavit was infirm due to not being based in fact and lacking probable cause; their DeKalb County arrest warrant was infirm due to lacking probable cause; and their accusations against Defendant in the Fulton County

indictment were not based in fact and lacked probable cause, making the charges against them infirm. Defendants have known that the allegations they brought against Plaintiff were false yet continued their actions.

175. Defendant Long, in concert with all Defendants and in coordination with Defendant Carter, intentionally and recklessly made misstatements and omissions to support the arrest warrant, because Plaintiff was not trespassing; did not have muddy clothes from breaching and crossing an embankment; did not possess a shield; did not have rocks, fireworks, or Molotov cocktails; did not have the phone number of the "Atlanta Solidarity Fund Jail Support Line" in their clothing or written on their person; and was a legitimate attendee of the music festival at the public park. No reasonable officer would have concluded that criminal activity was afoot based on the specific facts related to Plaintiff.

176. Defendant Long, in concert with all Defendants and in coordination with Defendant Carter, intentionally and recklessly made misstatements and omissions to support his testimony for the indictment, because Plaintiff is not a part of the non-existent "Defend the Atlanta Forest" criminal enterprise; and, on March 5, 2023, Plaintiff was not trespassing on the public Intrenchment Creek Park, nor did Plaintiff join an organized mob of individuals to overwhelm law enforcement to occupy the DeKalb forest and cause property damage. No reasonable officer would have concluded that criminal activity was afoot based on the specific facts related to Plaintiff.

177. Even without the misstatements and omissions, there were insufficient facts to support any criminal process, in violation of Plaintiff's clearly established rights.

Specifically, without the misstatements and omissions, Plaintiff was merely attending the free music festival at the public park, like hundreds of others around them, including the Georgia resident arrestees that Defendants decided to release.

178. Even without the infirm legal process, Defendants' seizure and prosecution of Plaintiff were not justified, because, as explained in paragraph 172, no reasonable officer would have found sufficient facts or circumstances to conclude that Plaintiff had committed or was committing a criminal offense at the public park to merit tackling Plaintiff; stopping them from leaving the music festival; fully seizing them after the initial stop; arresting them with handcuffs to transport them for questioning; detaining them in jail overnight without a warrant; investigating them; and seeking felony charges against them in two counties.

179. Defendants knew that there were insufficient facts to support the seizure and prosecution of Plaintiff, and no reasonable officer would have concluded otherwise based on clearly established law.

180. Defendants acted with malice, because they knew that they lacked probable cause to arrest, detain, investigate, and seek criminal charges against Plaintiff.

181. Defendants acted with malice, because they knowingly and recklessly utilized false information, misstatements, and omissions to support their arrest warrant and testimony for an indictment against Plaintiff.

182. Despite knowing that they had scant facts to support their actions, as well as the lack of sufficient grounds to merit any criminal process, Defendants have relentlessly continued their unreasonable actions against Plaintiff under color of law.

183. Defendants have affirmatively acted to continue the prosecution against Plaintiff, because, although they knew they lacked the requisite facts, they seized and detained Plaintiff; transported Plaintiff to further detention and questioning at the public park; booked Plaintiff into DeKalb County Jail overnight; prepared a factually inaccurate affidavit to obtain an arrest warrant in DeKalb County; swore out the DeKalb County arrest warrant in concert; continued to investigate Plaintiff; provided false information to the State to keep them in jail at the DeKalb County bond hearing; continued to investigate Plaintiff to seek an indictment against Plaintiff in Fulton County; provided false information to the Fulton County grand jury to obtain an indictment against Plaintiff; and have continued to be active in the baseless criminal investigation against Plaintiff.

184. Defendants' false statements were material to Plaintiff's seizure and prosecution pursuant to legal process, because, but-for Defendants' malicious actions, the DeKalb County District Attorney's Office and then the Georgia Attorney General's Office would not have continued criminal prosecutions for serious felonies in DeKalb County and Fulton County. Moreover, Defendants' malicious actions led to Plaintiff's incarceration in both counties. Hence, Defendants' investigation and conduct directly caused Plaintiff's prolonged seizure, arrest warrant, and indictment.

185. A reasonable officer would have known that Defendants' DeKalb County unsupported affidavit failed to establish probable cause for a warrant under O.C.G.A. § 16-11-220, violating Plaintiff's clearly established rights, because the right to be

free of prosecution without probable cause was well established before 2023. Yet Defendants sought this infirm arrest warrant against Plaintiff.

186.    A reasonable officer would have known that Defendants lacked facts to establish probable cause for the Fulton County indictment under O.C.G.A. § 16-14-4(c), violating Plaintiff's clearly established rights, because the right to be free of prosecution without probable cause was well established before 2023. Yet Defendants provided false testimony for this infirm indictment against Plaintiff.

187.    The prosecutions against Plaintiff will likely terminate in their favor.[16]

188.    Defendants' actions have directly and proximately caused significant damages to Plaintiff, including, but not limited to, being publicly broadcast to the world as a "domestic terrorist" and "RICO co-conspirator," forever tarnishing Plaintiff's personal and professional life; difficulty finding employment; difficulty securing housing; mental distress at having decades in prison lingering over their daily life; three (3) weeks of incarceration at the deadly DeKalb County Jail; physical, psychological, financial, and ongoing mental harms due to the prolonged incarceration; mental, physical, and financial harms due to the ankle monitor they were forced to wear for three (3) months, as well as reputational harms from the accompanying stigma; a deprivation of their fundamental right to travel due to the ban from Georgia and confiscation of their U.S. passport for nineteen (19) months, as

---

[16] "If a plaintiff files a false-arrest claim before he has been convicted (or files any other claim related to rulings that will likely be made in a pending or anticipated criminal trial), it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended." Wallace v. Kato, 549 U.S. 384, 393-94, 127 S. Ct. 1091, 1098 (2007); see also Watts v. Epps, 475 F. Supp. 2d 1367, 1369 (N.D. Ga. 2007) ("[I]t is the issuance of a stay--and not the tolling of an action--that is the appropriate prophylactic device to prevent federal courts from undercutting state criminal convictions by preordaining in § 1983 actions the constitutionality of arrests or seizures."), Hannah Kass v. Lt. Ramirez et al., 1:24-cv-02095-TRJ at DE 23 (N.D. Ga.) (granting Joint Motion to Stay, based on similarly pending criminal charges).

well as loss of opportunity and harms to their education and professional future due to the inability to participate in a competitive international study abroad program; mental and physical harms from having to report to DeKalb Pretrial Services once a week for nineteen (19) months; over a day of incarceration at the deadly Fulton County Jail; physical, psychological harms, financial loss; and ongoing mental harms due to the incarceration; a physical ban from Carolina Law, directly affecting Plaintiff's education, reputation, finances, and psychological well-being; an impact on Plaintiff's ability to obtain a North Carolina bar license, harming their professional career and financial future; extreme emotional and psychological effects due to foreseeable right-winger doxing, incarceration, and the serious felony charges they're facing, requiring the continuous care of a licensed mental health professional; financial and employment harms due to the travel requirements of the pending Fulton County case; mental and physical harms from having to regularly report to Fulton Pretrial Services; and all consequential damages flowing from these harms, including attorney fees and other legal expenses.

189.   An evil motive and intent can be reasonably inferred from Defendants' intentional misstatements and omissions when they initiated criminal prosecutions against Plaintiff.

190.   Defendants were recklessly and callously indifferent to Plaintiff's federally protected rights, because they intentionally seized and detained Plaintiff despite lacking sufficient underlying facts, taking affirmative steps to violate Plaintiff's Fourth Amendment rights. Defendants had numerous opportunities to release Plaintiff and

stop the pursuit of the criminal charges, as they did with other seized-and-released

festival attendees, yet they continued their unconstitutional actions against Plaintiff.

WHEREFORE, Plaintiff demands judgment and compensatory, consequential, and

punitive damages against Defendants Special Agent Ryan Long, Special Agent Michael Carter,

Game Warden Quintin Reed, Trooper Cl. Thomas, Deputy Chief Jessica Bruce, Major Jeff

Cantin, Deputy Chief Gary Harper, and John and Jane Doe's 1-100; and, in addition, demands

attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988. Plaintiff demands trial by jury

on all issues so triable.

### COUNT IV
### CONSPIRACY TO DEPRIVE OF CIVIL RIGHTS
### BY FALSE ARREST, MALICIOUS PROSECUTION &
### FIRST AMENDMENT RETALIATION
### UNDER 42 U.S.C. § 1983
### Against All Defendants Except City of Atlanta

191.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in

paragraphs 1 through 137 above.

192.    Pursuant to 42 U.S.C. § 1983, government agents are prohibited from entering into an

agreement to violate a person's civil rights.

193.    Defendants are government agents who, during all times and while committing every

action described in this Complaint, were each acting under the authority granted by

Georgia law enforcement agencies, and therefore were acting under the color of law.

194.    Defendants entered into an agreement to violate Plaintiff's civil rights by jointly

raiding the March 5 music festival at the public park and collaborating in the unlawful

arrest and prosecutions of Plaintiff, a legitimate festival attendee engaging in

protected speech. Throughout the events of March 5, Defendants were actively

participating in concert and in full communication, under the direction of Defendants Long, Carter, Bruce, Cantin, and Harper, and according to a pre-established plan, pursuant to the policy of Defendant Atlanta. This agreement is clearly evidenced by the fact that as soon as Defendant Reed interacted with Plaintiff, under the directions of Defendant Thomas, Defendant Reed suddenly and unlawfully arrested Plaintiff and then agreed to transfer custody to Defendant Long, who then sought false charges against Plaintiff, in coordination with Defendant Carter and other Defendant Officers.

195.    By the time Defendants arrived to the public park, they had reached an understanding, reflected by the totality of the evidence, which they actively executed and participated in: Defendant Officers arrived to the park to violate Plaintiff's rights by silencing, seizing, detaining, and prosecuting them, regardless of clearly established law.

196.    Defendants took several over acts in furtherance of their conspiracy to deprive Plaintiff of their civil rights, including, but not limited to, unlawfully seizing and detaining Plaintiff; transporting Plaintiff to further detention and questioning at the public park; booking Plaintiff into DeKalb County Jail overnight; preparing a factually inaccurate affidavit to obtain an arrest warrant in DeKalb County; swearing out the DeKalb County arrest warrant in concert; continuing to investigate Plaintiff; providing false information to the State to keep them in jail at the DeKalb County bond hearing; continuing to investigate Plaintiff to seek an indictment against Plaintiff in Fulton County; providing false information to the Fulton County grand jury to obtain an indictment against Plaintiff; and continuing to be active in the baseless criminal investigation against Plaintiff.

197.    Defendants' conspiracy actually denied Plaintiff of their federal rights, specifically,

their Fourth Amendment and First Amendment rights.

198.    Regarding Defendants' conspiracy's actual violation of Plaintiff's Fourth Amendment

rights, Plaintiff incorporates by reference paragraphs 138 to 150 and 169 to 190.[17]

199.    Regarding Defendants' conspiracy's actual violation of Plaintiff's First Amendment

rights, Plaintiff incorporates by reference paragraphs 151 to 168.

200.    Defendants' conspiracy involved multiple Georgia law enforcement agencies,

including, but not limited to, GBI, DNR, APD, GSP, FPD, and DKPD. Indeed,

Defendants Carter and Long were on-duty officers of GBI; Defendant Reed was an

on-duty warden of DNR; Defendant Thomas was on-duty trooper of GSP; Defendants

Bruce, Cantin, and Harper were on-duty high officers of APD; and members of

Defendants John and Jane Doe's 1-100 were on-duty officers of other agencies.

201.    Defendants' conduct violated 18 U.S.C. § 241, because more than two people

conspired to injure, oppress, and intimidate Plaintiff in the free exercise or enjoyment

of their First and Fourth Amendment rights; and 18 U.S.C § 242, because Defendants

did, under color of law, deprive Plaintiff of their rights and privileges under the First

and Fourth Amendment.

202.    Defendants' actions have directly and proximately caused significant damages to

Plaintiff, including, but not limited to, being publicly broadcast to the world as a

---

[17] "If a plaintiff files a false-arrest claim before he has been convicted (or files any other claim related to rulings that will likely be made in a pending or anticipated criminal trial), it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended." Wallace v. Kato, 549 U.S. 384, 393-94, 127 S. Ct. 1091, 1098 (2007); see also Watts v. Epps, 475 F. Supp. 2d 1367, 1369 (N.D. Ga. 2007) ("[I]t is the issuance of a stay--and not the tolling of an action--that is the appropriate prophylactic device to prevent federal courts from undercutting state criminal convictions by preordaining in § 1983 actions the constitutionality of arrests or seizures."), Hannah Kass v. Lt. Ramirez et al., 1:24-cv-02095-TRJ at DE 23 (N.D. Ga.) (granting Joint Motion to Stay, based on similarly pending criminal charges).

"domestic terrorist" and "RICO co-conspirator," forever tarnishing Plaintiff's personal and professional life; difficulty finding employment; difficulty securing housing; mental distress at having decades in prison lingering over their daily life; three (3) weeks of incarceration at the deadly DeKalb County Jail; physical, psychological, financial, and ongoing mental harms due to the prolonged incarceration; mental, physical, and financial harms due to the ankle monitor they were forced to wear for three (3) months, as well as reputational harms from the accompanying stigma; a deprivation of their fundamental right to travel due to the ban from Georgia and confiscation of their U.S. passport for nineteen (19) months, as well as loss of opportunity and harms to their education and professional future due to the inability to participate in a competitive international study abroad program; mental and physical harms from having to report to DeKalb Pretrial Services once a week for nineteen (19) months; over a day of incarceration at the deadly Fulton County Jail; physical, psychological harms, financial loss; and ongoing mental harms due to the incarceration; a physical ban from Carolina Law, directly affecting Plaintiff's education, reputation, finances, and psychological well-being; an impact on Plaintiff's ability to obtain a North Carolina bar license, harming their professional career and financial future; extreme emotional and psychological effects due to foreseeable right-winger doxing, incarceration, and the serious felony charges they're facing, requiring the continuous care of a licensed mental health professional; financial and employment harms due to the travel requirements of the pending Fulton County case; mental and physical harms from having to regularly report to Fulton

Pretrial Services; and all consequential damages flowing from these harms, including attorney fees and other legal expenses.

203. An evil motive and intent can be reasonably inferred from Defendants' express agreement to violate the constitutional rights of Plaintiff, as well as Defendants' intentional misstatements and omissions when they initiated criminal prosecutions against Plaintiff.

204. Defendants were recklessly and callously indifferent to Plaintiff's federally protected rights, because they intentionally targeted Plaintiff based on their protected speech, taking affirmative steps to violate Plaintiff's First Amendment rights; and they intentionally seized and detained Plaintiff despite lacking sufficient underlying facts, taking affirmative steps to violate Plaintiff's Fourth Amendment rights. Defendants had numerous opportunities to release Plaintiff and stop the pursuit of the criminal charges, as they did with other seized-and-released festival attendees, yet they continued their unconstitutional actions against Plaintiff.

WHEREFORE, Plaintiff demands judgment and compensatory, consequential, and punitive damages against Defendants Special Agent Ryan Long, Special Agent Michael Carter, Game Warden Quintin Reed, Trooper Cl. Thomas, Deputy Chief Jessica Bruce, Major Jeff Cantin, Deputy Chief Gary Harper, and John and Jane Doe's 1-100; and, in addition, demands attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988. Plaintiff demands trial by jury on all issues so triable.

## COUNT V
## DEPRIVATION OF CIVIL RIGHTS
## BY MUNICIPAL POLICY AND CUSTOM
## UNDER 42 U.S.C. § 1983 & *MONELL*
## Against City of Atlanta

205.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in

   paragraphs 1 through 137 above.

206.    Pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), municipalities are

   liable under 42 U.S.C. § 1983 based on an adopted policy or custom that causes a

   constitutional violation.

207.    Defendant Atlanta is a Georgia municipality.

208.    APD Chief Darin Schierbaum, an individual vested with ultimate, non-reviewable

   decision-making authority by Defendant Atlanta, adopted the inter-agency, blanket

   Stop Cop City policy to quash protests against Cop City in advancement of Defendant

   Atlanta's interests. Accordingly, all law enforcement officers working with APD had

   an order to execute the Stop Cop City policy.

209.    Defendant Atlanta's Stop Cop City policy mandates law enforcement officers, under

   the direction of high-ranking officers of Defendant Atlanta's APD, to arrest and

   pretextually charge individuals perceived to be protesting Cop City, regardless of the

   underlying facts, circumstances, lawfulness, or constitutional protections. Hence, the

   blanket policy, by design, orders law enforcement to commit unconstitutional seizures

   and prosecutions.

210. Pursuant to the Stop Cop City policy, Defendant Atlanta's APD officers have been surveilling all events in opposition to Cop City, always prepared to execute the policy by deploying officers to arrest and pretextually arrest perceived participants.

211. Over multiple years, and in at least fifteen (15), non-isolated, separate instances, APD Chief Darin Schierbaum and other high-ranking officers of Defendant Atlanta, including Defendants Bruce, Cantin, and Harper, have ordered and ratified the execution of the Stop Cop City policy, including, as detailed on paragraph 32, on September 8, 2021 (Gadomski, Simon, Smith, Zapata, Olmechenko); January 28, 2022; May 14, 2022 (Streiff, Seal, Dixon, Silverstein); May 17, 2022; May 22, 2022; June 7, 2022; June 15, 2022 (Watchulonis); July 22, 2022 (Aira, Dickhaus, Leckert, Maurer, Noyes, Walter); December 13, 2022; December 15, 2022; January 18, 2022 (Paez); June 30, 2023; and December 22, 2023.

212. APD Chief Darin Schierbaum delegated his full and final policy-making authority to Defendants Long and Carter during the Weelaunee Forest raids of May 14, 2022; December 13, 2022; and January 18, 2022. Accordingly, Defendants Long and Carter enforced and expanded the Stop Cop City policy during those dates.

213. Defendant Atlanta's conduct amounts to a custom and practice of Defendant Atlanta, because, repeatedly, over multiple years, and in a clear pattern, final policy-makers for the municipality have ordered and ratified the arrests and pretextual charges against perceived Stop Cop City protesters.

214. Given the consistent, continuous, and systemic arrests and pretextual charges against Stop Cop City protesters through multiple years and contexts, there is a reasonable

inference that APD Chief Darin Schierbaum and other final decision-makers of Defendant Atlanta routinely ratify these unconstitutional decisions, resulting in a municipal policy, custom, and generalized practice.

215. The final decisions related to the Stop Cop City policy made by APD Chief Darin Schierbaum, Assistant Chiefs, Majors, and Lieutenants, including Defendants Bruce, Cantin, and Harper, as well as Defendants Long and Carter, are not subject to any meaningful opportunity for review. There is no administrative process to challenge or review the high officers' decisions.

216. During the March 5, 2023, raid of the Weelaunee Forest, APD Chief Darin Schierbaum and other final decision-makers of Defendant Atlanta, including Defendants Bruce, Cantin, and Harper, ordered and ratified the execution of the Stop Cop City policy, just as in the previous fifteen (15) instances. Specifically, Defendant Officers were directed to arrest and pretextually charge music festival attendees, deemed to be protesters against Cop City.

217. During the March 5, 2023, raid of the Weelaunee Forest, APD Chief Darin Schierbaum delegated his full and final policy-making authority to Defendants Long and Carter, just as during the last three Weelaunee Forest raids. Under this non-reviewable authority, Defendants Long and Carter coordinated the joint operation against legitimate attendees of the Stop Cop City music festival.

218. During the March 5, 2023, raid of the Weelaunee Forest, the final decisions made by high-ranking officers of Defendant Atlanta, including Defendants Bruce, Cantin, and

Harper, as well as by Defendants Long and Carter, had no meaningful opportunity for review, just as in the previous fifteen (15) instances.

219. Due to Defendant Atlanta's Stop Cop City policy, Plaintiff's constitutional rights were violated, specifically, their Fourth Amendment and First Amendment rights. Regarding the violations of these civil rights, Plaintiff incorporates by reference paragraphs 138 to 150 and 169 to 190, and 151 to 168, respectively.

220. Defendant Atlanta's Stop Cop City policy was the moving force behind the deprivation of Plaintiff's civil rights, because, pursuant to that specific policy, Defendants Long and Carter, under the direction of Defendants Bruce, Cantin, Harper, and APD Chief Darin Schierbaum, coordinated the arrest and pretextual charges against attendees of the music festival expressing opposition to the Cop City project.

221. Defendant Atlanta's Stop Cop City policy caused the violations of Plaintiff's constitutional rights, because, but-for Defendant Atlanta's Stop Cop City policy, Defendant Reed, under the direction of Defendant Thomas, would not have arrested Plaintiff; Defendant Long, in concert with Defendants, would not have sought pretextual charges in two separate jurisdictions; and Defendant Officers would not have participated in the advancement of this seizure, detention, and prosecution.

222. Defendant Atlanta's actions have directly and proximately caused significant damages to Plaintiff, including, but not limited to, being publicly broadcast to the world as a "domestic terrorist" and "RICO co-conspirator," forever tarnishing Plaintiff's personal and professional life; difficulty finding employment; difficulty

securing housing; mental distress at having decades in prison lingering over their daily life; three (3) weeks of incarceration at the deadly DeKalb County Jail; physical, psychological, financial, and ongoing mental harms due to the prolonged incarceration; mental, physical, and financial harms due to the ankle monitor they were forced to wear for three (3) months, as well as reputational harms from the accompanying stigma; a deprivation of their fundamental right to travel due to the ban from Georgia and confiscation of their U.S. passport for nineteen (19) months, as well as loss of opportunity and harms to their education and professional future due to the inability to participate in a competitive international study abroad program; mental and physical harms from having to report to DeKalb Pretrial Services once a week for nineteen (19) months; over a day of incarceration at the deadly Fulton County Jail; physical, psychological harms, financial loss; and ongoing mental harms due to the incarceration; a physical ban from Carolina Law, directly affecting Plaintiff's education, reputation, finances, and psychological well-being; an impact on Plaintiff's ability to obtain a North Carolina bar license, harming their professional career and financial future; extreme emotional and psychological effects due to foreseeable right-winger doxing, incarceration, and the serious felony charges they're facing, requiring the continuous care of a licensed mental health professional; financial and employment harms due to the travel requirements of the pending Fulton County case; mental and physical harms from having to regularly report to Fulton Pretrial Services; and all consequential damages flowing from these harms, including attorney fees and other legal expenses.

WHEREFORE, Plaintiff demands judgment, compensatory, and consequential damages against Defendant Atlanta and, in addition, demands attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988. Plaintiff demands trial by jury on all issues so triable.

### COUNT VI
### MALICIOUS PROSECUTION
### UNDER O.C.G.A. § 51-7-40
### Against All Defendants Except City of Atlanta

223.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 137 above.

224.    O.C.G.A. § 51-7-40 creates a private cause of action when a criminal prosecution is carried on maliciously and without any probable cause, causing damage to the person prosecuted.

225.    Defendants are actively prosecuting Plaintiff for two criminal offenses, based on the same underlying facts and warrantless arrest on March 5, 2023: a violation of O.C.G.A. § 16-11-220 in DeKalb County and a violation of O.C.G.A. § 16-14-4(c) in Fulton County.

226.    Defendants instigated the DeKalb County prosecution through an infirm arrest warrant sought by Defendant Long, in concert with all Defendants, from a DeKalb County Magistrate. To obtain this warrant, Defendant Long, in concert with all Defendants and direct coordination with Defendants Reed, Thomas, and Carter, intentionally and recklessly made misstatements and omissions, because Plaintiff was not trespassing; did not have muddy clothes from breaching and crossing an embankment; did not possess a shield; did not have rocks, fireworks, or Molotov cocktails; did not have the phone number of the "Atlanta Solidarity Fund Jail Support

Line" in their clothing or written on their person; and was a legitimate attendee of the music festival at the public park.

227.    Defendants instigated the Fulton County prosecution through Defendant Long's false testimony for an indictment, in concert with all Defendants. Defendant Long, in concert with all Defendants and in coordination with Defendant Carter, intentionally and recklessly made misstatements and omissions to support his testimony for the indictment, because Plaintiff is not a part of the non-existent "Defend the Atlanta Forest" criminal enterprise; and, on March 5, 2023, Plaintiff was not trespassing on the public Intrenchment Creek Park, nor did Plaintiff join an organized mob of individuals to overwhelm law enforcement to occupy the DeKalb forest and cause property damage.

228.    The prosecutions against Plaintiff will likely terminate in their favor.[18]

229.    Defendants acted with malice, because they knew that they lacked probable cause to arrest, investigate, and seek criminal charges against Plaintiff. In addition, Defendants knowingly and recklessly utilized false information, misstatements, and omissions to support their arrest warrant and testimony for an indictment against Plaintiff.

230.    Defendants' intentional actions against Plaintiff, resulting in incarceration and two serious felony accusations in two jurisdictions, were malicious, because they show a general disregard of the right consideration of others, directed at Plaintiff.

---

[18] "If a plaintiff files a false-arrest claim before he has been convicted (or files any other claim related to rulings that will likely be made in a pending or anticipated criminal trial), it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended." Wallace v. Kato, 549 U.S. 384, 393-94, 127 S. Ct. 1091, 1098 (2007); see also Watts v. Epps, 475 F. Supp. 2d 1367, 1369 (N.D. Ga. 2007) ("[I]t is the issuance of a stay--and not the tolling of an action--that is the appropriate prophylactic device to prevent federal courts from undercutting state criminal convictions by preordaining in § 1983 actions the constitutionality of arrests or seizures."), Hannah Kass v. Lt. Ramirez et al., 1:24-cv-02095-TRJ at DE 23 (N.D. Ga.) (granting Joint Motion to Stay, based on similarly pending criminal charges).

231.    Defendant Reed lacked probable cause when he arrested Plaintiff, because no

reasonable officer would have concluded that criminal activity was afoot based on the

specific facts related to Plaintiff: Plaintiff was located hours and miles away from the

fire at the construction site; was not trespassing; did not have wet clothes; was fully

visible in the daytime; did not have muddy clothes from breaching and crossing an

embankment; did not possess a shield; did not have rocks, fireworks, or Molotov

cocktails; did not have the phone number of the "Atlanta Solidarity Fund Jail Support

Line" in their clothing or written on their person; and was a legitimate attendee of the

music festival at the public park.

232.    Defendant Long, in concert with all Defendants, lacked probable cause for the arrest

warrant against Plaintiff, because Plaintiff was located hours and miles away from the

fire at the construction site; was not trespassing; did not have wet clothes; did not

have muddy clothes from breaching and crossing an embankment; did not possess a

shield; did not have rocks, fireworks, or Molotov cocktails; did not have the phone

number of the "Atlanta Solidarity Fund Jail Support Line" in their clothing or written

on their person; and was a legitimate attendee of the music festival at the public park.

Based on all known facts, no reasonable officer would have concluded that Plaintiff

violated O.C.G.A. § 16-11-220.

233.    Defendant Long, in concert with all Defendants, lacked probable cause for the

indictment against Plaintiff, because Plaintiff is not a part of the non-existent "Defend

the Atlanta Forest" criminal enterprise; and, on March 5, 2023, Plaintiff was not

trespassing on the public Intrenchment Creek Park, nor did Plaintiff join an organized

mob of individuals to overwhelm law enforcement to occupy the DeKalb forest and cause property damage. Based on all known facts, no reasonable officer would have concluded that Plaintiff violated O.C.G.A. § 16-14-4(c).

234.    Defendants acted with actual malice, because they deliberately intended to wrongfully seize, detain, and prosecute Plaintiff, despite insufficient facts to support these decisions. As demonstrated by their actions, Defendants intended to harm Plaintiff by incarcerating and prosecuting them, because they utilized false information to do so. Defendants' choices were not split-second decisions by reasonable officers: Defendants executed the unsupported prosecutions over a prolonged time, as part of a pre-planned scheme to deprive Plaintiff of their liberty, punish them for their political expression, and advance Defendants' political goals.

235.    A reasonable officer would have known that Defendants' DeKalb County unsupported affidavit failed to establish probable cause for a warrant under O.C.G.A. § 16-11-220, violating Plaintiff's clearly established rights, because the right to be free of prosecution without probable cause was well established before 2023. Yet Defendants sought this infirm arrest warrant against Plaintiff.

236.    A reasonable officer would have known that Defendants lacked facts to establish probable cause for the Fulton County indictment under O.C.G.A. § 16-14-4(c), violating Plaintiff's clearly established rights, because the right to be free of prosecution without probable cause was well established before 2023. Yet Defendants provided false testimony for this infirm indictment against Plaintiff.

237. An evil motive and intent can be reasonably inferred from Defendants' intentional misstatements and omissions when they initiated criminal prosecutions against Plaintiff.

238. Defendants were recklessly and callously indifferent to Plaintiff's federally protected rights, because they intentionally seized and detained Plaintiff despite lacking sufficient underlying facts, taking affirmative steps to violate Plaintiff's Fourth Amendment rights. Defendants had numerous opportunities to release Plaintiff and stop the pursuit of the criminal charges, as they did with other seized-and-released festival attendees, yet they continued their unconstitutional actions against Plaintiff.

239. Defendants' actions have directly and proximately caused significant damages to Plaintiff, including, but not limited to, being publicly broadcast to the world as a "domestic terrorist" and "RICO co-conspirator," forever tarnishing Plaintiff's personal and professional life; difficulty finding employment; difficulty securing housing; mental distress at having decades in prison lingering over their daily life; three (3) weeks of incarceration at the deadly DeKalb County Jail; physical, psychological, financial, and ongoing mental harms due to the prolonged incarceration; mental, physical, and financial harms due to the ankle monitor they were forced to wear for three (3) months, as well as reputational harms from the accompanying stigma; a deprivation of their fundamental right to travel due to the ban from Georgia and confiscation of their U.S. passport for nineteen (19) months, as well as loss of opportunity and harms to their education and professional future due to the inability to participate in a competitive international study abroad program;

mental and physical harms from having to report to DeKalb Pretrial Services once a week for nineteen (19) months; over a day of incarceration at the deadly Fulton County Jail; physical, psychological harms, financial loss; and ongoing mental harms due to the incarceration; a physical ban from Carolina Law, directly affecting Plaintiff's education, reputation, finances, and psychological well-being; an impact on Plaintiff's ability to obtain a North Carolina bar license, harming their professional career and financial future; extreme emotional and psychological effects due to foreseeable right-winger doxing, incarceration, and the serious felony charges they're facing, requiring the continuous care of a licensed mental health professional; financial and employment harms due to the travel requirements of the pending Fulton County case; mental and physical harms from having to regularly report to Fulton Pretrial Services; and all consequential damages flowing from these harms, including attorney fees and other legal expenses.

WHEREFORE, Plaintiff demands judgment and compensatory, consequential, and punitive damages against Defendants Special Agent Ryan Long, Special Agent Michael Carter, Game Warden Quintin Reed, Trooper Cl. Thomas, Deputy Chief Jessica Bruce, Major Jeff Cantin, Deputy Chief Gary Harper, and John and Jane Doe's 1-100; and, in addition, demands attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988. Plaintiff demands trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray that this Honorable Court enter judgment in Plaintiffs' favor, and against the Defendants, and: (a) for compensatory damages against all Defendants;

62 of 62

(b) consequential damages against all Defendants, (c) punitive damages against Defendants

Special Agent Ryan Long, Special Agent Michael Carter, Game Warden Quintin Reed, Tooper

Cl. Thomas, Deputy Chief Jessica Bruce, Major Jeff Cantin, Deputy Chief Gary Harper, and

John and Jane Doe's 1-100; (d) all costs and disbursements of this action and such other

attorney's fees; and (e) further relief as justice requires.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all

issues in this matter.

DATED, this 24th day of February, 2025.

/s/ Drago Cepar, Jr.
Drago Cepar, Jr.
Sponsor for Attorney for Plaintiff
Northern District of Georgia
Georgia Bar #142362
1900 The Exchange, Suite 490
Atlanta, Georgia 30339
Tel.: (770) 940-3233
E-mail: dcepar@gmail.com


/s/ Xavier Torres de Janon
Xavier T. de Janon
Attorney for Plaintiff
Pending *Pro Hac Vice* Admission
North Carolina Bar #58803
P.O. Box 5382
Charlotte, North Carolina 28299
Tel: (704) 448-9170
E-mail: xavier@dejanon.co